# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                          No. CR 05-2511 JB

PHILLIP ALBERT GRANT,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Mr. Grant's Motion for Suppression of Evidence and Incorporated Memorandum, filed January 9, 2006 (Doc. 17).  The Court held an evidentiary hearing on this motion on March 15, 2006 and on March 17, 2006.  The primary issue is whether New Mexico Transportation Division ("MTD") Officer Luke De La Garza had an objectively reasonable suspicion that Grant was attempting to evade the weigh station at the port of entry ("POE") in Lordsburg, New Mexico, thus justifying the traffic stop.  Because the Court concludes that De La Garza did not have a reasonable suspicion to believe Grant committed a traffic violation, the Court will grant his request to suppress evidence seized and statements made.

## STANDARD OF REVIEW

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of

evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 1101(d)(1). Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

## FINDINGS OF FACT

1.      MTD officers enforce, in the field, provisions of the Motor Vehicle Act and the regulations that the Public Regulation Commission has promulgated pursuant to that Act.  See NMSA § 65-1-6A.

2.      The MTD enforcement employees, designated by the division director, are police officers as defined in NMSA § 29-7-7.

3.      A New Mexico MTD POE for eastbound traffic is located near Lordsburg, New Mexico, at exit 23, between exits 24 and 20, of Interstate 10 ("I-10").  See Transcript of Hearing at 48:8-16; 4:6-7 (taken March 15, 2006)(Luke De La Garza)[1]; Map of Lordsburg (Government Exhibit 1).

4.      At the POE, commercial vehicles get weighed, the driver is required to show a New Mexico permit, the drivers are required to produce their logbooks, and the officers at the POE perform random inspections of the commercial vehicles.  See id. at 43:19-44:4.

5.      A Pilot gas station is located off exit 24 of I-10, and a Luv's gas station is located off exit 20 of I-10.  See id. at 46:7-9.  Pilot and Luv's are the two most common gas stations that

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

commercial vehicles traveling on I-10 use on that stretch of the interstate.  See id. at 54:11-14.

6.      Motel Drive is a highway with two lanes each direction, running parallel with I-10. See id. at 7:14-8:6.  Luv's is located at the west end of Motel Drive, and Pilot is located at the east end.  See id. at 19:14-19.

7.      On October 26, 2005, at approximately 10:50 p.m., De La Garza, on patrol, in full uniform and in a fully marked MTD vehicle, initiated a traffic stop at Luv's gas station on Motel Drive in Lordsburg.  See id. at 5:25-6:12.

8.      After De La Garza finished the traffic stop at Luv's, he proceeded east on Motel Drive and, at approximately 11:15 p.m., he observed a commercial vehicle traveling east on Motel Drive ahead of him.  See id. at 7:14-8:11.  De La Garza did not observe whether the commercial vehicle was at Luv's, but rather first saw the commercial vehicle traveling ahead of him, after De La Garza started driving east on Motel Drive.  See id. at 12:15-13:2 (taken March 17, 2006).  De La Garza first observed the commercial vehicle traveling east on Motel Drive, west of the below described traffic sign.  See id. at 45:12-23 (taken March 15, 2006).

9.      On Motel Drive, in the eastbound direction, between Luv's and Pilot, there is a traffic sign located at Main Street for commercial vehicles -- approximately two miles west of Pilot and exit 24.  The sign directs eastbound commercial vehicles to turn right on Main Street to the eastbound POE and directs westbound commercial vehicles to continue straight ahead.  See id. at 9:2-5, 10:23-25, 32:24-35:10; Investigator Videotape of Motel Drive (Defense Exhibit A); Photograph of Traffic Sign (Defense Exhibit B).[2]

---

[2] De La Garza testified that the sign signaling westbound traffic to continue straight ahead on Motel Drive is meant to direct traffic coming into Lordsburg from Highway 70 and that he encountered Grant west of Highway 70 on Motel.  See Transcript of Hearing at 9:23-25; 10:3-14 (De

10.     De La Garza observed that Grant's commercial vehicle traveled past the traffic sign directing all I-10 eastbound commercial vehicles to the eastbound POE on I-10, and continued east on Motel Drive.  <u>See</u> Transcript of Hearing at 9:2-5, 10:15-18 (taken March 15, 2006)(De La Garza).

11.     Eastbound commercial truck drivers commonly use Motel Drive to evade the Lordsburg MTD POE.  <u>See id.</u> at 8:14-18; 12:4-7.  Motel Drive is used every day to bypass the POE. <u>See id.</u> 8:20-23.

12.     It is a "little unusual" to see a commercial vehicle traveling on Motel Drive at 11:15 p.m., because there is not a lot of traffic on Motel Drive at that time of night.  <u>Id.</u> at 12:6-11 (taken March 17, 2006).

13.     Commercial truck drivers traveling east on I-10 often leave the interstate at Exit 20, travel east on Motel Drive, and then get back on the interstate at exit 24, after they pass exit 23 and the MTD POE.[3]  <u>See id.</u> at 12:8-13 (taken March 15, 2006).

14.     Chapter 65 of the New Mexico Statutes Annotated, addresses Motor Carriers and Article 5 of Chapter 65 addresses Procedures for Vehicles Entering or Leaving State.

---

La Garza).  These statements may be true, but the Court has reviewed the videotape recording of the traffic sign on Motel Drive and the photograph of the sign, and the Court does not believe such evidence, combined with De La Garza's conclusory statement about the intent of the sign, establishes that the sign directing westbound traffic to continue straight ahead is meant only to direct traffic coming in from Highway 70.

[3] De La Garza sometimes testified that Pilot was located at exit 24 and at other times that Pilot was located at exit 23.  <u>See</u> Transcript of Hearing at 12:8-23;18:22-25; 51:7-21 (taken March 15, 2006).  The Court finds that Pilot was located at exit 24, as it is more consistent with the rest of De La Garza's testimony.  For example, De La Garza stated that the distance between Luv's and Pilot was four miles.  <u>See id.</u> at 51:22-25.  He also stated that he stopped Grant approximately one and one half miles past Main Street and that Pilot was two miles past Main Street.  <u>See id.</u> at 13:10-14.  The four miles between Luv's and Pilot is consistent with the fact that Luv's was located at exit 20 and Pilot was located at exit 24.

15.     NMSA § 65-5-1 is entitled:   "Vehicles to stop at ports of entry; information; inspection."

16.     NMSA § 65-5-1A:   "All commercial motor carrier vehicles, as defined in the Motor Transportation Act, must enter, leave or travel through the state on designated highways and shall stop at every port of entry as designated by the division for manifesting and clearance stickers."

17.     When De La Garza observed the commercial vehicle drive past the traffic sign, he believed that it was bypassing the POE, and he initiated a traffic stop.  See Transcript of Hearing at 10:15-18; 12:23-13:9 (taken March 15, 2006)(De La Garza).

18.     Grant was driving the commercial vehicle that De La Garza first observed traveling east on Motel Drive and that De La Garza stopped after it traveled past the traffic sign.  See id. at 13:22-24.

19.     De La Garza eventually stopped Grant approximately one and one half miles east of the traffic sign -- directing all eastbound traffic to turn right and all westbound traffic to continue straight ahead -- and one-half mile west of Pilot -- before Grant reached exit 24.  See id. at 13:12-14.

20.     Exit 24 is the exit where Pilot is located, and where eastbound trucks bypassing the POE get back on I-10 heading eastbound.  See id. at 12:8-23;18:22-25; 51:7-21.

21.     It takes approximately 4-5 minutes to drive from Luv's to Pilot on Motel Drive.  See id. at 52:8-12.

22.     Grant was traveling westbound with his commercial vehicle.  See id. at 13:22-14:7.

23.     NMSA § 65-5-1B states: "The operators of any motor vehicle described in Subsection A of this section shall, upon request, make out and deliver to the agent of the division a manifest showing that part of the following information requested:  . . .  (5) the state in which the vehicle has

-5-

been granted a common or contract motor carrier permit, if any, and the number of the permit. . . ."

24.     NMSA § 65-5-1C states:  "The person in charge of the port of entry may . . . check the . . . permit . . . of the vehicle."

25.     De La Garza obtained the bill of lading from Grant.  See Transcript of Hearing at 13:22-14:7 (taken March 15, 2006)(De La Garza).  De La Garza believed the bill of lading was suspicious because it contained misspellings, the abbreviation for Texas was in lower case, and the seal was handwritten.  See id. at 15:6-25; 39:10-40:5.

26.     Grant failed to provide a valid permit, so De La Garza subsequently inspected the trailer's cargo and discovered a green leafy substance -- verified as marijuana -- in the trailer.  See id. at 16:13-19, 17:21-18:17; 38:6-39:9; New Mexico Tax ID Permit (Government Exhibit 3).

27.     De La Garza had Grant unlock the padlock on the trailer, De La Garza broke the seal on the trailer, and then De La Garza entered the trailer alone, to inspect the cargo.  See Transcript of Hearing at 17:18-18:17; 24:7-25:18; 29:11-31:6; 44:25-45:8 (taken March 15, 2006)(De La Garza).  De La Garza found boxes in the trailer, and inside the boxes he found a green leafy substance that he verified as marijuana.  See id.

28      There are gas stations located at exit 22 off of I-10, on Main Street, that will accommodate a commercial vehicle at 11:15 p.m.  See id. at 50:7-18.  They are not located on Motel Drive.  See id. at 13:3-20 (taken March 17, 2006).

29.     On Motel Drive there are only two gas stations open at 11:15 p.m. at night -- Luv's and Pilot, and one motel is open.  No other businesses are open at that time of night on Motel Drive.  See id. at 19:14-19; 50:24-51:6 (taken March 15, 2006).

30.     De La Garza based his suspicion that Grant was evading the POE on the following:

(i)  Motel Drive is commonly used by commercial vehicles to bypass the POE; (ii) Grant, traveling east on Motel Drive, passed the sign that instructs eastbound traffic to turn right on Main Street, and directs westbound traffic to continue straight ahead; and (iii) Grant was traveling at 11:15 p.m. at night.  There was nothing in particular about Grant or the commercial vehicle he was driving that De La Garza found suspicious.  De La Garza initiated the stop once Grant passed the traffic sign directing eastbound commercial vehicles to turn right to the POE and directing westbound vehicles to continue straight ahead.  See id. at 8:12-9:5; 35:16-36:7; 46:21-47:15.

31.     De La Garza believes he has the authority to stop any commercial vehicle traveling east on Motel Drive that passes the traffic sign directing eastbound commercial vehicles to turn right to the POE and directing westbound vehicles to continue straight ahead, that he had the authority to stop Grant's vehicle because it fell within that general category, and that there was nothing else about Grant or his vehicle that gave rise to his suspicion.  See id. at 46:21-47:15.

## PROCEDURAL BACKGROUND

A grand jury charged Grant by indictment filed on November 16, 2005 with possession of more than 100 kilograms of marijuana with intent to distribute it.  See Indictment (Doc. 7).  Grant was arraigned on December 2, 2005, and entered a not guilty plea.  See Clerk's Minutes of Arraignment, filed December 2, 2005 (Doc. 9).  Grant is presently free on conditions of release.  See Order Setting Conditions of Release, filed November 2, 2005 (Doc. 5); Appearance Bond, filed November 2, 2005 (Doc. 6).

Grant's counsel conferred with Assistant United States Attorney Mark A. Saltman regarding this motion, and the United States opposes and objects to the motion.  See Mr. Grants Motion for Suppression of Evidence and Incorporated Memorandum ¶ 2, at 1.  Grant moves the Court for the

suppression of evidence.  See id. at 1.  Grant also requests an evidentiary hearing on his motion.  See id. ¶ 3, at 1.[4]

When Grant filed his motion, he had not received De La Garza's report.  See id. at 2 n.1.  Disclosure of discovery was ongoing, however, and Grant expected the disclosure of that report.  See id.

In his motion, Grant states that he may supplement this motion once all discovery has been provided.  See id.  After the first hearing, and before the second hearing, Grant filed a supplemental brief on the motion.  See Supplement to Mr. Grant's Motion for Suppression of Evidence and Incorporated Memorandum, filed March 17, 2006 (Doc. 30).  After the second hearing, the United States filed a response to this supplemental brief, see United States' Response to Defendant's Supplemental Brief, filed March 24, 2006 (Doc. 33), and Grant subsequently filed a reply to the United States Response, see Mr. Grant's Reply to Prosecution's Response to Mr. Grant's Supplement to Motion to Suppress Evidence, filed April 3, 2006 (Doc. 38).

## FOURTH AMENDMENT LAW

The Fourth Amendment protects an individual's right to be secure in his person and effects

---

[4] In connection with the requested evidentiary hearing, and if the United States does not otherwise disclose the information, Grant further requests in his motion, pursuant to rule 26.2 of the Federal Rules of Criminal Procedures, that the United States disclose to his attorney at least forty-eight hours before the hearing any statements, including grand jury testimony, of suppression hearing witnesses.  See id. ¶ 4, at 1-2.  Grant states that he makes this request to avoid delays in the conduct of the hearing which would result if his counsel is required to seek multiple recesses to review materials that the United States provides at the hearing.  See id.  Finally, Grant requests the opportunity to raise any other motions and arguments, the need for which may arise based on the evidence that may develop during any evidentiary hearing.  See id. ¶ 6, at 2.  Because Grant did not pursue these requests at the two hearings that the Court held on this motion, the Court assumes that the United States satisfied these needs and that the recess for him to secure a tape of the stop resolves any issues other then those associated with his request that the Court suppress any evidence that resulted from the initial stop.

against unreasonable searches and seizures.  In analyzing Fourth Amendment search and seizure issues, the United States Court of Appeals for the Tenth Circuit has separated police and citizen interactions into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).

A traffic stop is an investigative detention and is analyzed according to the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968).  See United States v. Leos-Quijada, 107 F.3d 786, 792 (10th Cir. 1997)(citation omitted).  A routine traffic "stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Shareef, 100 F.3d 1491, 1500(10th Cir. 1996)(citations and internal quotations omitted).  The Tenth Circuit, in determining the reasonableness of an investigative detention, applies a two-prong test: (i) "whether the officer's action was justified at its inception"; and (ii) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Shareef, 100 F.3d at 1500 (quoting Terry v. Ohio, 392 U.S. at 20).

"The government bears the burden of showing that an officer possessed objectively reasonable and articulable suspicion."  United States v. Sieren, 68 Fed. Appx. 902, 904 (10th Cir. 2003)(citing United States v. Carhee, 27 F.3d 1493, 1496, n.2 (10th Cir. 1994)).  "Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the

evidence standard." United States v. Arvizu, 534 U.S. 266, 273 (2002)(citations and internal quotations omitted). There is no bright line test to determine what conduct satisfies reasonable suspicion. See Ornelas v. United States, 517 U.S. 690, 695-695 (1996)("[T]he [reasonable suspicion] standards are not readily, or even usefully, reduced to a neat set of legal rules.")(citation and internal quotations omitted). Reasonable suspicion requires that a police officer provide "some minimal level of objective justification." United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)(citations and internal quotations omitted). When making reasonable suspicion determinations, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Sieren, 68 Fed. Appx. at 904 (quoting United States v. Arvizu, 534 U.S. at 273).

When reviewing the totality of the circumstances, "Terry . . . precludes [a] divide-and-conquer analysis." United States v. Arvizu, 534 U.S. at 274. A court may not "evaluate and reject" each factor relied on by the officer in isolation, but rather must look at all of the factors together in the totality of the circumstances. Id.

"[T]he government need not show a violation actually occurred to justify an initial traffic stop." United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998). See United States v. Callarman, 273 F.3d 1284, 1287 (10th Cir. 2001)("[Officers had] reasonable articulable suspicion -- 'a particularized and objective basis' -- to believe that [a] crack substantially obstructed [the driver's] view of the street. It is irrelevant whether the observed crack was, in fact, large enough to constitute a violation of the law.")(citation omitted); United States v. Bradley, 219 F.Supp. 2d 1150, 1154 (D. Or. 2002)("It was reasonable for [the officer] to stop defendant based on his suspicion that the car windows were tinted too darkly . . . even if that turned out not to be the case.").

The Supreme Court in <u>United States v. Cortez</u>, 449 U.S. 411 (1981), identified a two-part analysis to determine if there is an objective and particularized basis sufficient to establish the reasonable suspicion standard:

> First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions -- inferences and deductions that might well elude an untrained person.
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same -- and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in <u>Terry v. Ohio</u>, supra, said that this demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.

<u>Id.</u> at 418 (citations and internal quotations omitted).

"General profiles that fit large numbers of innocent people do not establish reasonable suspicion." <u>United States v. Yousif</u>, 308 F.3d 820, 828 (8th Cir. 2002)(citing <u>United States v. Eustaquio</u>, 198 F.3d 1068, 1071 (8th Cir. 1999)). "The facts that [a defendant]'s vehicle [has] out-of-state license plates and [is] traveling on a highway that [is] known to the officers as a drug trafficking corridor cannot alone justify [a] stop because too many people fit this description for it to justify a reasonable suspicion of criminal activity." <u>Id.</u> (citations and internal quotations omitted). "It is irrelevant . . . whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop. It is also irrelevant

that the officer may have had other subjective motives for stopping the vehicle.  [A court's] sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction."  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995)(citations and internal quotations omitted)(en banc).

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).  Officers are not, however, "required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. . . . the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis."  Id. (citing Adams v. Williams, 407 U.S. 143, 144 (1972)).

Evidence is not considered "fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

## ANALYSIS

The stop of Grant's truck was unlawful.  It was not based on an objectively reasonable and particularized suspicion that Grant had violated or was currently violating a traffic law.  Accordingly, the Court will suppress the evidence that the government seized and the statements that Grant made

-12-

as fruit of the poisonous tree.

**I.      DE LA GARZA DID NOT HAVE A CONSTITUTIONALLY ADEQUATE BASIS FOR THE STOP.**

The United States does not contend that De La Garza has unfettered authority as an MTD roving patrol officer to stop all commercial vehicles, but rather recognizes that a MTD roving patrol officer must have reasonable suspicion to stop a commercial vehicle.  See United States Response to Defendant's Supplemental Brief at 6-7, filed March 24, 2006 (Doc. 33).  The Tenth Circuit has held that the New Mexico statute authorizing safety inspections by the New Mexico MTD is an adequate substitute for a warrant under the standards established in New York v. Burger, 482 U.S. 691 (1987).  See United States v. Vasquez-Castillo, 258 F.3d 1207, 1211-12 (10th Cir. 2001).  A MTD roving patrol officer cannot conduct a roving stop, or designate himself as a temporary port of entry.  See State v. Clark, 112 N.M. 500, 501-502, 816 P.2d 1122, 1123-24 (Ct App. 1991)(interpreting officer's authority under NMSA § 65-5-1). A MTD roving patrol officer may, however, stop a commercial vehicle if the officer has reasonable suspicion that the driver had violated or was violating a law.  See id.  De La Garza did not, however, have an objectively reasonable and particularized suspicion that Grant was violating or had violated any traffic laws by attempting to evade the weigh station at the Lordsburg POE.  Because De La Garza did not have an objectively reasonable and particularized suspicion that Grant had committed or was committing a traffic violation, the initial traffic stop was unconstitutional.

The United States offers the following as providing De La Garza a reasonable and particularized suspicion that Grant was attempting to evade the POE: (i) De La Garza first observed Grant traveling east on Motel Drive; (ii) he saw Grant drive past the traffic sign; (iii) Motel Drive is

a business route commonly used by commercial vehicles to evade the POE; (iv) De La Garza has

stopped hundreds of commercial vehicles traveling east on Motel Drive attempting to evade the POE;

(v) De La Garza could not recall the last time he had stopped a commercial vehicle traveling east on

Motel Drive, where that vehicle had been traveling westbound on I-10 immediately prior to driving

east on Motel Drive[5]; (vi) the commercial vehicle's route of travel was unusual; (vii) it was 11:15

p.m. and most of the businesses along Motel Drive were closed; and (viii) De La Garza never saw

Grant traveling west on I-10.  See United States Response to Defendant's Supplemental Brief at 4-5.

The Court does not believe that these factors establish reasonable and particularized suspicion that

Grant was attempting to evade the POE. [6]

_____

[5] De La Garza did not actually testify that he could not recall the last time he had stopped a commercial vehicle traveling east on Motel Drive, where that vehicle had been traveling westbound on I-10 immediately prior to driving east on Motel Drive.  Rather, he testified that it hardly happened, and that when it did happen, it was because the driver was looking for a motel or "something." Transcript of Hearing at 12:14-21 (taken March 15, 2006)(De La Garza).

[6] Grant cites United States v. Ogilvie, 527 F.2d 330, 331-32 (9th Cir. 1975), for the proposition that avoidance of a checkpoint, without more, is insufficient to support a finding of reasonable suspicion.  In United States v. Ogilvie, the checkpoint was used to detect whether a vehicle contained aliens who were illegally in the country. See id.  Avoidance of the checkpoint there was not the illegal conduct in violation of a traffic law, but rather the transporting of the aliens was the illegal conduct.  Here, the avoidance of the POE in itself is illegal and avoidance of the POE can therefore be sufficient, by itself, to establish reasonable suspicion that a traffic law was violated or currently is being violated.  The United States cites several cases for the proposition that evasion of a checkpoint combined with other factors satisfies reasonable suspicion of illegal activity.  First, a reasonable suspicion that a commercial vehicle is evading a POE is sufficient by itself to justify a traffic stop as discussed above, and, therefore if there was sufficient evidence to show a reasonable suspicion that Grant was evading the POE, the United States would not have to present additional factors to show the Defendant's illegal conduct.  Second, each case that the United States relies on for this proposition is distinguishable from the present case, because each seizure was based on particularized suspicion rather than general profiling.  See United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1493 (9th Cir. 1994)(relying on the location of the incident on a highway notorious for alien smugglers at a peak time for smuggling, the lack of acknowledgment or eye contact between the suspect and the agents, a car favored by alien smugglers, the suspect's ethnicity, the rapid driving away from the checkpoint, aggressive swerving in and out of lanes to pass vehicles, and the abrupt

Despite the United States attempt to multiply the factors, all of these factors amount to one fact -- De La Garza saw Grant traveling east on a road that is frequently used to evade the POE, at 11:15 p.m. at night, and he passed a traffic sign that directed I-10 eastbound traffic to turn right on Main Street and directed westbound traffic to continue straight ahead.  This factor is not sufficient to establish that this particular officer had a reasonable suspicion that this particular defendant was violating a traffic law.

First, the traffic sign itself instructs all westbound traffic driving east on Motel Drive to drive straight ahead, and, although De La Garza believes this sign is for motorists coming off of Highway 70, nothing about the sign itself would indicate to all commercial vehicles driving east on Motel Drive that the sign was only meant for those vehicles coming off Highway 70.  It is illogical to hold that a reasonable suspicion can be based on a commercial vehicle driver obeying a traffic sign.  Grant followed directions by continuing straight ahead on Motel Drive as he was westbound on I-10.  Allowing a reasonable suspicion to be based on commercial vehicles driving past this traffic sign would allow officers to stop wholly innocent commercial vehicle drivers for merely obeying a traffic sign.

---

exiting of the vehicle onto a different highway to find reasonable suspicion); United States v. John Doe, 701 F.2d 819, 821 (9th Cir. 1983)(relying on the location of the area as a route used to avoid the checkpoint, the car drove south riding high and returned heavily laden, and the agents who stopped the car sufficiently identified it by color and kind as the one to which the first agent alerted them, to find reasonable suspicion that the vehicle was harboring aliens illegally); United States v. Roberts, 470 F.2d 858, 859 (9th Cir. 1972)(relying on the location of the area as the route was frequently used by those transporting aliens who have entered the country illegally to bypass an immigration checkpoint on a main highway, and a car that was riding low passed by the officers with a passenger slouched down in the front passenger seat); United States v. Garcia-Barron, 116 F.3d 1305, 1307-08 (9th Cir. 1997)(relying on the time of day, the route taken, the failure to turn off at either of the most common destinations for the limited traffic that legitimately traveled the road, the fact that the area was known for alien smuggling, and the use of a rental car to find reasonable suspicion).

Second, although Motel Drive is frequently used to bypass the POE, there are also innocent reasons for a westbound commercial vehicle to drive east on Motel Drive beyond the traffic sign. First, westbound vehicles could be obeying the sign and driving straight ahead toward the westbound POE. Second, drivers could be driving to the Budget Motel on Motel Drive to sleep for the night. The United States argues that this explanation makes no sense, because there is a hotel at Luv's right off of exit 20. This argument assumes that all drivers are identical in their preference as to which hotel or motel to sleep in, and that every hotel or motel is identical in room rates, parking accessibility, room vacancy, and any other factors on which patrons base their renting decisions.

Third, and also likely, commercial vehicle drivers could be driving to the Pilot to get gas. De La Garza testified that he hardly ever stops commercial vehicles traveling east on Motel Drive when in fact they are traveling westbound on I-10. <u>See</u> Transcript of Hearing at 12:14-22 (taken March 15, 2006). He also stated, however, that when he did get that response, it was a driver that was looking for a "motel or something." <u>Id.</u> at 12:20-22. Here, De La Garza testified that, when he initiated the traffic stop, Grant had not yet passed the Budget Motel, located east of the traffic sign and open at that time. In addition, Grant was stopped west of the Pilot, which was open at that time.

The United States argues that it would not make sense for a commercial vehicle to pass the Pilot going westbound and then pass the gas stations on exit 22 only to drive east on Motel Drive back to the Pilot. The Court disagrees and believes that there are reasonable explanations for this travel. For example, a commercial vehicle driver may prefer to purchase gas at Luv's or use Luv's parking for whatever reason, only to find Luv's full. At that point, it is reasonable for the driver to continue east on Motel Drive for "4-5" minutes back to the Pilot -- the only other gas station on Motel Drive.

Also, although De La Garza testified that all other businesses were closed on Motel Drive at 11:15 p.m. at night, see Transcript of Hearing at 8:1-9:11 (taken March 17, 2006); 49:1-5 (taken March 17, 2006), many innocent drivers could be traveling on Motel Drive looking for a grocery store, or place to eat, without any knowledge of the surrounding area.  The United States' argument assumes that commercial vehicle drivers have driven their current route before, and are intimately familiar with every road and exit off of such route.  The Court can envision many drivers who have never before driven on Motel Drive who are, for instance, innocently looking for a place to eat, a motel to sleep in, a gas station, or a place to park a commercial vehicle for the night, without having the intimate knowledge that a police officer or resident of Lordsburg would have.

Finally, although the stop occurred at 11:15 p.m., and De La Garza testified that it was "a little unusual" to find commercial vehicles driving east on Motel Drive at that time of night because most of the businesses were closed, he did not link such unusual conduct to the act of attempting to evade the POE.  He did not testify that those fewer commercial vehicles driving on Motel Drive at night were more likely to be attempting to evade the POE, or that commercial vehicles driving at night usually did so in an attempt to evade the POE.  Also, the Court notes that it is hard to quantify the term "a little unusual."  It could mean slightly out of the ordinary, but does not connote to the Court that it rarely occurs or even that it seldom occurs, but rather that, at most, it ordinarily does not occur.

The United States contends that "[i]t strains the imagination to think of what else a reasonable MTD officer could have done to confirm his suspicion short of following the [commercial vehicle] down the interstate."  United States' Response to Defendant's Supplemental Brief at 5.  First, De La Garza would not have had to follow Grant down the interstate.  As soon as Grant signaled to get on

I-10 eastbound, or even got on the I-10 eastbound on-ramp, De La Garza's "suspicion" would have been confirmed.  Second, because an officer may not detain someone based on a hunch, there are many times that a police officer may have a hunch or suspicion that is not a <u>reasonable</u> suspicion that would easily be confirmed by detention, but detention in such situations is not permissible. Regardless how hard it is to confirm a suspicion short of detention, until a police officer has a reasonable suspicion that the suspect is engaged in criminal activity, that officer may not detain such suspect.  Third, the Court does not believe that requiring De La Garza to do minimal further investigation under these circumstances places a burden on him.  For example, here, De La Garza turned on his lights as soon as Grant passed the traffic sign, and only two minutes from exit 24, where those commercial drivers who are evading the POE get back on the free way and head eastbound on I-10.  It would have been relatively easy for De La Garza to wait 120 seconds to see if Grant was bypassing the POE, and there is no evidence before the Court that stopping a vehicle after it enters the interstate on-ramp or the interstate itself would have been particularly dangerous.  It may be obvious that it is more dangerous than stopping the vehicle on Motel Drive, but there is no evidence that there is any great danger in pulling over a commercial vehicle on the interstate.

The Court notes that the Fourth Amendment does not require police officers to account for every possible innocent explanation before initiating an investigative detention, <u>see</u> <u>United States v. Arvizu</u>, 534 U.S. at 277 (citation omitted), and that the Court should avoid unrealistic second guessing of officers' decisions as well as accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions, <u>see</u> <u>United States v. Alvarez</u>, 68 F.3d 1242, 1244 (10th Cir. 1995)(citations and internal quotations omitted), but officers are not allowed to use "general profiles that fit large numbers of innocent people" to establish

reasonable suspicion in contradiction with the Tenth Circuit's finding in United States v. Yousif, 308 F.3d at 828. The Court does not believe that De La Garza has a reasonable and particularized suspicion to stop all commercial vehicles traveling east on Motel Drive as soon as they pass the traffic sign regardless of the time of day or night. Such suspicion is not individualized, but rather is a generalized profile that could include a large number of innocent drivers traveling east on Motel Drive for innocent reasons. There is simply nothing particular about Grant and the commercial vehicle he was driving that would distinguish him from every other commercial vehicle traveling east on Motel Drive. De La Garza specifically testified that: (i) he "believe[d] he [has] the authority to stop all eastbound trucks after they've passed that detour sign"; (ii) Grant fit within that general group; and (iii) that there was nothing else about Grant or his vehicle that gave rise to his suspicion. See Transcript of Hearing at 46:21-47:15 (taken March 15, 2006).

The United States argued at the March 17, 2006 hearing that De La Garza had additional reasonable suspicion because he specifically saw that Grant did not travel onto Motel Drive off of Highway 70, and that De La Garza does not stop that category of commercial vehicles that drives east on Motel Drive past the traffic sign. De La Garza admitted, however, on cross examination, that his statement on direct was not accurate, because commercial vehicles traveling from Highway 70 could be traveling eastbound on I-10 or westbound on I-10. See Transcript of Hearing at 7:5-16; 11:3-15 (taken March 17, 2006). The Court found his testimony on March 15, 2006, credible when he testified that his suspicion was based on nothing more than the fact that, at 11:00 p.m., Grant drove past a traffic sign directing eastbound traffic to turn right and westbound traffic to continue straight ahead, on a road that is frequently used to bypass the POE.

The situation here is similar to that noted in Illinois v. Wardlow, 528 U.S. 119, where the

-19-

Supreme Court of the United States found that a defendant's presence in an area of expected criminal activity is not sufficient, alone, to establish reasonable suspicion. Here, the United States argues that De La Garza had a reasonable suspicion that Grant had or currently was violating the traffic laws because he was driving a commercial vehicle east on Motel Drive, a road currently used to bypass the POE at 11:00 p.m. at night. It appears to the Court that De La Garza's suspicion was based on nothing more than that Grant happened to be in an area of expected criminal activity. That Grant was traveling "in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion" that Grant was violating a traffic law. Illinois v. Wardlow, 528 U.S. at 124. See United States v. Yousif, 308 F.3d at 828 ("The facts that [a defendant]'s vehicle [has] out-of-state license plates and [is] traveling on a highway that was known to the officers as a drug trafficking corridor cannot alone justify the stop because too many people fit this description for it to justify a reasonable suspicion of criminal activity."). There has to be something more particularized about Grant or his vehicle that would take him out of simply being a member of a general profile group that includes wholly innocent people.

The Court is mindful not to engage in the "divide-and-conquer" analysis that the Supreme Court in United States v. Arvizu, 534 U.S. 266 (2002), found improper. Id. at 274. The Court has looked at the totality of the circumstances, and concludes that these circumstances, in combination or alone, do not equate to reasonable suspicion. The Constitution does not allow a police officer to detain all commercial vehicles traveling east at 11:15 p.m., past a traffic sign directing eastbound traffic to turn right and westbound traffic to continue straight ahead, on a road frequently used to bypass a POE. The Court notes that, because Grant was driving a commercial vehicle at 11:15 p.m. on a road frequently used to bypass the POE, reasonable suspicion could be met with almost any

amount of particularized suspicion.  For example, if De La Garza had seen anything in particular about this commercial vehicle -- traveling eastbound on I-10 before getting off at exit 20 and then driving past the traffic sign, or filling up at Luv's and then driving past the traffic sign and the Budget Motel -- or about this particular driver -- if Grant had looked nervous, or acted out of the ordinary -- the Court might find that reasonable suspicion was met.  Here, however, the United States would have the Court find lawful De La Garza's stopping of all commercial vehicles that he observes driving east past the traffic sign at 11:15 p.m.  The Court will not do so, but rather, believes that the Constitution requires something more.[7]

## II.    ANY STATEMENTS AND EVIDENCE DISCOVERED AFTER THE STOP ARE FRUITS OF THE POISONOUS TREE AND THE COURT WILL SUPPRESS THEM.

The statements and tangible evidence De La Garza discovered after the stop are fruits of the poisonous tree subject to suppression in accord with Wong Sun v. United States, 371 U.S. 471 (1963), because the initial detention and search was not justified and the United States has not put forth any evidence that the original taint was cleansed.  Indeed, at the March 17, 2006 hearing, the United States conceded this point.  See Transcript of Hearing at 25:23-26:6.  Accordingly, the Court will suppress any evidence seized or obtained following the unconstitutional stop of Grant's vehicle as the fruit of a poisonous tree.  The warrantless search of Grant's vehicle was unlawful and violated his Fourth Amendment rights.  It was undertaken without probable cause or reasonable suspicion,

---

[7] Grant argued at the March 17, 2006 hearing and in his supplemental brief that, even if the initial stop was lawful, the resulting search was unlawful.  See generally Supplement to Mr. Grant's Motion for Suppression of Evidence and Incorporated Memorandum; Transcript of Hearing at 14:25-21:9 (taken March 17, 2006).  Because the Court finds that the initial stop was unlawful, it need not decide whether the resulting search itself -- standing alone -- was lawful or whether it exceeded the scope of the initial detention.  Grant and the United States agreed at the second hearing, that if the Court found that the initial detention was invalid, it did not need to address the issue of the lawfulness of the search itself.  See Transcript of Hearing at 16:8-12; 25:23-26:16 (taken March 17, 2006).

and without Grant's valid consent.  Because the search of Grant's truck was the result of an illegal

detention and arrest, the Court will  suppress the evidence seized and any statements made as a result

of the search of the vehicle.  See Wong Sun v. United States, 371 U.S. at 487-88.

      **IT IS ORDERED** that Mr. Grant's Motion for Suppression of Evidence and Incorporated

Memorandum is granted.  The Court will suppress any evidence and statements that were obtained

as a result of Grant's unlawful detention.

                                                              _____
                                                UNITED STATES DISTRICT JUDGE

*Counsel:*

David C. Iglesias
  United States Attorney for the
    District of New Mexico
Mark A Saltman
  Special Assistant United States Attorney
    for the District of New Mexico
Las Cruces,  New Mexico

      *Attorneys for the Plaintiff*

Marc H. Robert
  Assistant Federal Public Defender
Federal Public Defender's Office
Las Cruces,  New Mexico

      *Attorneys for the Defendant*